**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUN 30 2020

JAMES W. McCORMACK, CLERK
By: _____
DEP CLERK

### IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS
### DELTA DIVISION

**JEREMY JOHNSON AND FELICIA JOHNSON,**
**INDIVIDUALLY AND AS PARENTS OF THE**
**MINOR CHILD, MJ**                                              **PLAINTIFFS**

**VS.**                          CASE NO. 2:20cv139-DPM

This case assigned to District Judge Marshall
and to Magistrate Judge Volpe

**ERIC SIMMONS, INDIVIDUALLY AND**
**IN HIS OFFICIAL CAPACITY AS PRINCIPAL**
**OF THE LAKE VILLAGE SCHOOL DISTRICT**                          **DEFENDANTS**

### COMPLAINT

Comes the Plaintiffs, Jeremy Johnson and Felicia Johnson, by and through counsel,

**SUTTER & GILLHAM, P.L.L.C.,** and, for this Complaint, they state:

### PARTIES & JURISDICTION

1.  Plaintiffs are residents and citizens of Chicot County, Arkansas, who bring this action on

behalf of themselves and their minor child, MJ, who attends school in the Lake Village School

District.  Separate Defendant, Eric Simmons, who is the Principal of MJ's school, who is sued in

his Individual and Official Capacity.  This is an action for violation of MJ's constitutional rights

as allowed 42 USC § 1983, for violation of Title II of the Americans with Disabilities of 1990, and

for violation of § 504 of the Rehabilitation Act of 1973, as amended.  This Court has federal

question, subject matter, jurisdiction under 28 USC § 1331, and venue is proper under 28 USC

§1391(b). Plaintiffs also bring claims under the Arkansas Civil Rights Act of 1993, and this Court

has supplemental jurisdiction of those claims under 28 USC §1357.  Since the acts giving rise to

this action arose in Chicot County, Arkansas, venue is proper under 28 USC § 1391(b).  All actions

were taken under the color of law.  By virtue of the order attached hereto as Exhibit "A,"

incorporated herein by reference, all administrative remedies have been exhausted, and the parents

seek fees for these proceedings.

1

## GENERAL ALLEGATIONS OF FACTS

2. Plaintiffs' minor daughter (hereinafter "MJ"), was five (5) years old when she started kindergarten at the Lake Village School District in August, 2019. MJ has some mental deficits that substantially limited her ability to think, communicate and concentrate, as well as control her impulses.

3. MJ has been diagnosed as a ADHD, and she has been evaluated for expressive deficits. She is substantially limited in one (1) or more major life activities as a result of the mental impairments.

4. Once MJ started school, she began having behavioral control problems. Rather than identifying MJ as a possible child with a disability, according to Child Find, the school district began discipling MJ, eventually changing her placement to an alternative learning environment. Before being transferred to the alternative learning environment, Defendant(s) approached MJ's mother and advised her that he had a child with ADHD and that MJ appeared to be suffering from ADHD as well.

5. So, Ms. Johnson took her child to a physician who confirmed the diagnosis and prescribed MJ medication.

6. Ms. Johnson then reported this back to Principal, Eric Simmons (hereinafter "Principal").

7. Plaintiff Johnson also took MJ to Delta Counseling, who created a report that identified the child as a person with a disability as reflected in Exhibit "A."

8. Before MJ was transferred to ALE, Plaintiffs gave Simmons a copy of this report and he did nothing.

2

9. Federal Law, including the ADA, the IDEA, and Section 504, require the Defendant(s) to *immediately* obtain a referral for an evaluation for MJ. However, Defendant(s) did not do this. Instead, Defendant(s) made a conscious decision to *ignore* the information contained within the Delta Counseling report and the transfer MJ to the ALE.

10. The placement in ALE was reckless. No reasonable educator would have transferred MJ to the ALE without obtaining a proper evaluation in order to make sure that the placement was proper given MJ's mental impairments and disabilities. Nonetheless, this is precisely what Defendant(s) did.

11. Indeed Defendant(s) also knew that MJ would be in a classroom with older children who were aggressive.

12. Defendant(s) also knew MJ's teacher in the ALE environment did not have special training to monitor children such as MJ.

13. So, Plaintiffs allege that the school district failed to train Ms. Higgins.

14. Nonetheless, MJ started attending ALE in the Fall of 2019.

15. In January, 2020, MJ was forced to perform to oral sex on another child by two (2) 11-year old kids.

16. Had MJ been appropriately evaluated, MJ would not have been placed in the ALE and would not have been sexually assaulted

### COUNT I

17. Plaintiffs reallege the foregoing as if more fully set out herein.

18. By virtue of the facts alleged herein, MJ has a disability within the meaning of Section 504, Title II of the ADA, IDEA and the Arkansas Civil Rights Act of 1993.

19. By virtue of the facts alleged herein, Defendants have discriminated against MJ on the basis of her disability by failing to the provide services to her in the least restrictive environment and by completely ignoring their obligations under IDEA and Section 504.

20. Indeed, the school district has failed to train its teachers in the proper evaluation and supervision of children like MJ. This failure led to MJ being sexually assaulted. Had these teachers been properly trained, MJ would not have been referred for discipline based upon her behavior, nor would she have been placed in ALE. Therefore, she would not have been sexually assaulted because she would not have been in that environment.

21. By virtue of the facts alleged herein, the school district has violated Child Find. Upon information and belief, Plaintiffs allege that many of the children placed in ALE are children with disabilities whom the school district has not properly evaluated. Indeed, the school district has a pattern and practice of placing children with disabilities into the ALE simply to "warehouse" them instead of providing them free, and appropriate, public education.

22. By virtue of the facts alleged herein, MJ was denied a free, appropriate public education as demonstrated by the hearing officer's decision attached hereto as ***Exhibit A***.

23. The individual Defendant, Eric Simmons, has been deliberately indifferent to MJ's disability, and no reasonable educator would have allowed MJ to be placed into ALE in light of the information contained in the Delta Counseling report. Separate Defendant, Eric Simmons, ignored this information and deliberately chose to place MJ into the ALE, thereby discriminating against her on the basis of her disability.

24. As a direct and proximate cause of Defendant(s) actions as alleged herein, each Plaintiff has suffered severe mental and emotional distress, has incurred medical expenses in the past and will incur medical expenses in the future, has exacerbated MJ's disability, rendering her chances of employment almost non-existent, and has caused the parents to incur lost wages.

4

25. By virtue of the facts alleged herein, Separate Defendant, Eric Simmons, should be held liable for punitive damages under the Arkansas Civil Rights Act of 1993.

## COUNT II

26. Plaintiffs reallege the foregoing as if more fully set out herein.

27. MJ had a clearly established right to bodily integrity under our state and federal constitutions.  MJ was subjected to a educational environment that was hostile and pervasive. Defendant(s) have violated Title IX, as well as deprived MJ of her clearly established right to be free from violation of her bodily integrity.

28. The Defendant has also denied MJ of her Due Process rights, such that Plaintiffs bring this action for violation of due process as well, as allowed by 42 USC 1983 and the ACRA.

29. As a result of Defendant(s) violation of Title IX and deprivation of Plaintiffs' constitutional rights, Plaintiffs have suffered severe mental and emotional distress, lost wages, lost income, and incurred medicals expenses, both past and in the future.

30. The Separate Defendant(s) actions have been so egregious so as to warrant the imposition of punitive damages, as allowed by 42 USC § 1983 and the Arkansas Civil Rights Act of 1993.

## JURY DEMAND

31. Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs pray for appropriate compensatory and punitive damages; for reasonable attorneys' fees; for costs; trial by jury; and, for all other proper relief.

Respectfully submitted,

**SUTTER & GILLHAM, P.L.L.C.**
Attorneys at Law
P.O. Box 2012
Benton, AR 72018
501/315-1910  Office
501/315-1916  Facsimile
Attorneys for the Plaintiff

By:  */s/ Luther Oneal Sutter*
Luther Oneal Sutter, Esq., ARBN 95-031
luther.sutterlaw@gmail.com



# Division of Elementary and Secondary Education

*Transforming Arkansas to lead the nation in student-focused education*

**Johnny Key**
*Secretary*

**State Board
of Education**

**Diane Zook**
*Melbourne*
**Chair**

**Charisse Dean**
*Little Rock*
**Vice Chair**

**Susan Chambers**
*Bella Vista*

**Dr. Fitz Hill**
*Little Rock*

**Kathy McFetridge**
*Springdale*

**Dr. Sarah Moore**
*Stuttgart*

**Ouida Newton**
*Poyen*

**Chad Pekron**
*Bryant*

**R. Brett Williamson**
*El Dorado*

**Four Capitol Mall
Little Rock, AR
72201-1019
(501) 682-4475
ArkansasEd.gov**

*An Equal
Opportunity
Employer*

June 22, 2020

Mr. Billy Adams, Superintendent
Lakeside School District
1110 Lakeshore Dr.
Lake Village, AR  71653

Felicia Johnson
6576 S. Hwy 159
Eudora, AR  71640

Re:   Due Process Hearing
      Case No.: H-20-22
      Student: Makala Johnson
      Public Agency: Lakeside School District

Dear Mr. Adams and Ms. Johnson:

Enclosed is a copy of the final Hearing Report and Decision concerning special education services for the student in the captioned case. Copies of hearing decisions are sent to both parties and their designated representatives.

The District is responsible for submitting a monthly report describing actions taken to implement the Hearing Officer's decision. The first report is due within thirty (30) calendar days of the date of the enclosed decision. Subsequent status reports shall be submitted every thirty (30) calendar days thereafter until it has been determined by the Special Education Unit that the public agency has complied with the directives of the Hearing Officer.

If additional information is needed, please contact the Office of the Special Education Unit at (501) 682-4291.

Sincerely,

Frederick Porter, Program Administrator
Dispute Resolution Section
Special Education Unit
Arkansas Department of Education

FP/bw
Enclosure

cc:    Luther Sutter, Attorney
        Cody Kees, Attorney
        Theresa Stinson, LEA Supervisor
        File

**ARKANSAS DEPARTMENT OF EDUCATION**
**Special Education Unit**

IN RE:

**FELICIA JOHNSON,** Parent on behalf of
**MAKALA JOHNSON,** Student                                    **PETITIONER**

VS.                                    **CASE NO. H-19-22**

**LAKESIDE SCHOOL DISTRICT**                                    **RESPONDENT**

## HEARING OFFICER'S FINAL DECISION AND ORDER

### ISSUES PRESENTED:

Whether the Lakeside School District (hereinafter "District") denied Makala Johnson (hereinafter "Student") a free, appropriate, public education (hereinafter "FAPE") between August 14,  2019 and February 18, 2020, in violation of certain procedural and substantive requirements of the Individuals with Disabilities in Education Act of 2004, 20 U.S.C. §§ 1400-1485, as amended (hereinafter "IDEA"), by failing to timely identify Student as eligible for special education programming, failing to consider an evaluation provided by Parent, failing to conduct appropriate, comprehensive, and timely evaluations, and failing to develop and implement an appropriate IEP.[1]

### PROCEDURAL HISTORY:

On February 18, 2020, the Arkansas Department of Education (hereinafter "Department") received a written request from Parent, through counsel, to initiate due process hearing procedures on behalf of Student. Based on Parent's complaint, Parent

---

[1] *See* Due Process Complaint and Petitioner's Post-Hearing Brief.

requested a due process hearing because she believed that District failed to comply with the IDEA by failing to identify student for special education services, failing to consider a parent-initiated evaluation, failing to evaluate Student, and failing to develop and implement an appropriate IEP.[2]

In response to Parent's request for hearing, the Department assigned the case to an impartial hearing officer. Thereafter, following a continuance on account of the COVID-19 pandemic, the date of May 5, 2020 was set as the date on which a hearing would commence, via ZOOM, if the Parent and District failed to reach resolution prior to that time. On April 24, 2020, a prehearing conference regarding this matter was conducted, via telephone. Counsel for both parties participated in the hearing. During the prehearing conference, the parties discussed unresolved issues to be litigated at the hearing of this matter, as well as the witnesses and evidence necessary to address same.

On May 5, 2020, the closed hearing of this matter commenced. All testimony was heard on this same date and the hearing was conducted via ZOOM on account of COVID-19. During the ZOOM hearing, Parent and her counsel were located in one office, District and its counsel were located at the Lakeside School District, and this Hearing Officer was at a separate location. The hearing concluded on May 5, 2020. The following witnesses testified in this matter:  Parent (mother), Billy Adams, Sarah Fairchild, Dr. Michelle Aliff, Teressa Stinson, and Clara Penney.[3]  Parent had the burden of proof regarding the issues raised in this case.

---

[2] *See* Due Process Complaint.
[3] *Id.*

Having been given jurisdiction and authority to conduct the hearing pursuant to Public Law 108-446, as amended, and Arkansas Code Annotated §§ 6-41-202 through 6-41-223, Danna J. Young, J.D., Hearing Officer for the Arkansas Department of Education, conducted a closed impartial hearing.  Parent was represented by Luther Sutter (Benton, Arkansas) and the District was represented by Cody Kees (Little Rock, Arkansas).  Both parties were offered the opportunity to provide post-hearing briefs.  Counsel for both parties timely submitted a brief for consideration by this Hearing Officer.

## FINDINGS OF FACT:

Student is a six-year-old female (DOB 01/13/2014) who is enrolled in the Lakeside School District. Between August 14, 2019 and February 18, 2020, the time period specified by Parent in her Due Process Complaint, Student was in kindergarten and enrolled in the Eudora Elementary School and, subsequently, the District's Transitional Learning Center.[4] Student, as of the date of this decision, has completed kindergarten and will be entering the first grade during the 2020-2021 school year.

Prior to entering kindergarten, Student attended a preschool program unrelated to the District and funded by Arkansas Better Chance.[5] While enrolled in that program, Student received special education services through the Southeast Arkansas Educational Cooperative.[6] The duration of those services was from November 17, 2017 to April 25, 2019. Services were terminated for Student because it was determined by the cooperative that Student was no longer eligible.[7]

---

[4] Ex. Vol. I, Parent Exs. 4, 5.
[5] Ex. Vol. I, Hearing Officer Ex. 1.
[6] *Id.*
[7] *Id.*

Upon completion of preschool, Student was enrolled in the Lakeside School District and assigned to attend kindergarten at Eudora Elementary School.[8] Student began exhibiting behavior problems almost immediately thereafter. Parent was presented with a "Student Behavior Plan" on September 5, 2019 which appears to be an agreement that Student would follow directions, stay in her seat unless given permission to move, use words to ask for help from her teacher, make good choices, accept responsibility for making bad choices, keep her "hands, feet, mean words and objects" to herself, and keep her hands away from her classmates and teacher's things.[9] The behavior plan stated rewards in the event that goals were met, as well as consequences in the event that they were not.[10] This behavior plan was essentially a behavior contract between the District, Parent, and Student. It did not specify any triggers to Student's behaviors or any specific action that the District would take in the event that Student exhibited certain behaviors.

Thereafter, within the same month, Student had four documented behavioral incidents.[11] The first behavioral incident occurred on September 9, 2019, pursuant to a discipline form completed by Student's teacher. Student refused to stay in her seat and violated the personal space of another student several times.[12] When Student's teacher redirected Student, Student told the teacher to "shut up" and to stop telling her what to do.[13] Thereafter, Student shoved her desk into another desk several times.[14] Eventually, Student's

---

[8] *Id.*

[9] Ex. Vol. I, Parent Ex. 1.

[10] *Id.*

[11] Ex. Vol. I, Parent Ex. 4; Ex. Vol. II, District pp. 84-87.

[12] Ex. Vol. I, Parent Ex. 4; Ex. Vol. II, District p. 84.

[13] *Id.*

[14] *Id.*

desk was moved away from the other students and placed near the teacher; however, Student continued to refuse to sit down and would not stop disrupting items on the teacher's desk.[15]

The second behavioral incident that was documented for Student occurred on September 10, 2019. The detailed explanation provided by District stated that Student told her teacher, as well as her foster grandparent, to "[s]hut up Bitch" after they both attempted to get student to sit down in her chair.[16] During this incident, Student stood in the teacher's chair and was spinning the chair in circles. [17] The District attempted to contact Student's Parent but was unsuccessful. Ultimately, another teacher had to intervene and assist with the situation.[18]

The third behavioral incident documented for Student occurred on September 17, 2019.[19] The discipline form for this incident indicates that Student raised her hand to hit her teacher after the teacher removed a pencil from Student's desk.[20] Student further verbalized to the teacher that she was going to hit her so that she could retrieve her pencil.[21] Thereafter, Student got up from her seat, approached the teacher's desk, and grabbed pencils off of the desk.[22] The discipline form indicates that Student was suspended as a result of this incident and could return to class "after meeting with Delta Counseling."[23]

---

[15] *Id.*
[16] *Id.*
[17] Ex. Vol. I, Parent Ex. 4; Ex. Vol. II, District p. 85.
[18] *Id.*
[19] Ex. Vol. I, Parent Ex. 4; Ex. Vol. II, District p. 86.
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.*

The fourth behavioral incident documented for Student occurred on September 24, 2019. Student pushed and pinched the teacher, as well as grabbed her clothing.[24] Student then hit the teacher once with an open hand and another time with a closed fist.[25] Student told the teacher that she would lie to Parent about what happened if the teacher attempted to report the incident to Parent.[26] Student further stated that she would fight the teacher if the teacher attempted to take her to the principal's office. On the way to the principal's office, Student continued to tell the teacher to "shut up" and when others tried to intervene, Student attempted to break away from them.[27]

The parties stipulated that Student has a qualifying disability pursuant to the IDEA.[28] Specifically, Student was diagnosed with "other specified disruptive, impulse-control and conduct disorder," as well as attention deficit hyperactivity disorder.[29] Student was diagnosed by a licensed social worker at Delta Counseling Associations on September 24, 2019.[30] According to this evaluation, Parent reported that she was receiving calls on almost a daily basis from the District on account of Student's behavior.[31] Parent reported that Student was kicking other students and screaming when she "didn't get her way."[32] The evaluation states that Student was talking back to teachers, failing to complete school work, failing to stay in her seat as directed, failing to focus on school work, engaging in rude and

---

[24] Ex. Vol. I, Parent Ex. 4; Ex. Vol. II, District p. 87.
[25] *Id.*
[26] *Id.*
[27] *Id.*
[28] Ex. Vol. I, Hearing Officer Ex. 1.
[29] Ex. Vol. I, Hearing Officer Ex. 1; Parent Ex. 1.
[30] Ex. Vol. I, Parent Ex. 2.
[31] *Id.*
[32] *Id.*

disrespectful behavior, and hitting others.[33] Student was prescribed medication as a result of her diagnoses. Parent sought this evaluation at the recommendation of Student's principal.[34]

On September 25, 2019, Student was referred from Eudora Elementary school to the District's Elementary Transitional Learning Center (hereinafter "TLC").[35] The documents in the record pertaining to the TLC include a "Student Action Plan," dated September 27, 2019, which specifies that Student needs to improve proficiency in math and reading levels.[36] There is also a TLC placement form that indicates all actions taken prior to referral to the TLC. These actions included contacting parent for support, parent conference at school, referral to the school counselor, referral to Delta Counseling Services, and classroom modifications.[37] Reasons for placement, in addition to the academic goal referenced in another document, include the following: (1) persistent lack of attaining proficiency levels in the subjects of math and reading; (2) disruptive behaviors; and (3) "[i]nadequate emotional support, mental/physical health problems."[38] Documents in the record indicate that Parent attended a conference regarding this transition via telephone on September 27, 2019.[39] At the time of this conference, Parent was still waiting to receive a report from Delta Counseling following Student's September 24, 2019 evaluation.[40] Parent and District

---

[33] *Id.*
[34] Tr. Vol. I, p. 187.
[35] Ex. Vol. I, Parent Exs. 3, 5; Ex. Vol. II, District Ex. p. 94.
[36] Ex. Vol. I, Parent Exs. 3, 5; Ex. Vol. II, District Ex. p. 98.
[37] Ex. Vol. I, Parent Exs. 3, 5; Ex. Vol. II, District Ex. p. 101.
[38] Ex. Vol. I, Parent Exs. 3, 5; Ex. Vol. II, District Ex. p. 102.
[39] Ex. Vol. I, Hearing Officer Ex. 1.
[40] *Id.*

stipulated that this report was provided by Parent to the District sometime after September 27, 2019, and that the District did not consider the report after it was received.[41]

Attached to the transition paperwork is a behavior log for the month of September 2019. The chart indicates that District called Parent on September 3, 2019 because Student disobeyed in the cafeteria and hall, hit or pushed another student, threw things, did not follow directions of teacher, and did not do class work.[42] On September 4, 2019, the chart indicates that Student received a consequence of no recess because she did not follow the direction of the teacher, did not do class work, and would not stay in her seat.[43] On September 5, 2019, parent was called because Student engaged in hitting or pushing, did not do class work, threw things, and would not stay in seat.[44] On September 6, 2019, Student had to visit the principal's office because she hit or pushed others, threw things, and would not stay in her seat.[45] The calendar shows nothing for the week of September 9, 2019; however, September 9 and 10 were both days in which Student received a written discipline form for behavior incidents, as described previously. On September 16, 2019, Student received a sad face because she did not follow directions of her teacher, did not do class work, and would not stay in her seat.[46] On September 17, 2019, Student did not follow directions of the teacher, hit or pushed others, did not do class work, threw things, and would not stay in her

---

[41] *Id.*
[42] Ex Vol. II, District Ex. p 120.
[43] *Id.*
[44] *Id.*
[45] *Id.*
[46] *Id.*

seat.[47] On September 18, 2019, Student was suspended from school for five days, returning to school on September 25, 2019 when she was moved to the TLC.[48]

After Student transitioned to the TLC, there is another behavioral incident documented in the record.[49] Specifically, on October 25, 2010, Student began hitting, kicking, and screaming in class.[50] She was given several warnings, to no avail, before she was taken to the principal's office.[51] Parent was called and subsequently sent someone to the school to pick up the Student.[52]

On January 30, 2020, principal for the District learned of two incidents that occurred in the TLC classroom on January 27 and 28, 2020.[53] Specifically, older students in the classroom directed Student to perform oral sex acts on them.[54] These acts were recorded. While this was occurring, the teacher assigned to the classroom was using her cell phone and not attending to the Students in the class. Parent removed Student from the District the following week, approximately February 3, 2020.[55] During Student's tenure in the TLC, she did not have any kind of behavior plan and was not considered for special education services.

On February 14, 2020, District hand delivered to Parent a formal letter providing educational services and supports to the Student.[56] Student subsequently reenrolled in the

---

[47] Id.
[48] Id.
[49] Ex. Vol. II, District Ex. p. 130.
[50] Id.
[51] Id.
[52] Id.
[53] Ex. Vol. I, Hearing Officer Ex. 1.
[54] Id.
[55] Id.
[56] Ex. Vol. II, District Ex. p. 132.

District and is receiving educational services through Alternative Methods of Instruction. In addition, a referral for special education services was made upon reenrollment.[57]

Parent sought a special education assessment from Dr. Michelle Aliff PhD, CRC, IPEC.[58] Dr. Aliff indicated in her report that she could not ascertain Student's academic skills and level from District documentation.[59] In addition, she noted the absence of any behavioral observations or plans.[60] Dr. Aliff recommended the following for Student: (1) comprehensive psychoeducational assessment; (2) comprehensive psychological evaluation to determine appropriate treatment plan to address Student's behaviors, as well as the sexual abuse and trauma she experienced while in the TLC; (3) family therapy to address the ramifications of Student's sexual abuse; (4) evaluation and development of a behavior plan by a Board Certified Behavior Analyst; (5) dedicated paraprofessional for protection of Student and Student's peers; and (6) compensatory education as needed.

Parent is seeking private placement pursuant to her Due Process Complaint and her testimony at the due process hearing.[61] She indicated that she would like Student to be enrolled in the Greenville Christian School in Greenville, Mississippi.[62] Parent stated that her husband's cousin placed his daughter there and he reported that the school is excellent. At the time of the due process hearing, Parent had not contacted the school, visited the school, or inquired about the services that the school offers.[63]

---

[57] *Id.*
[58] Ex. Vol. I, Parent Ex. 9.
[59] Ex. Vol. I, Parent Ex. 8.
[60] *Id.*
[61] Tr. Vol I, p. 204.
[62] *Id.*
[63]

## CONCLUSIONS OF LAW AND DISCUSSION:

Pursuant to Part B of the IDEA, states are required to provide a FAPE for all children with disabilities between the ages of three and twenty-one. 20 U.S.C. § 1412(a); 34 C.F.R. §300.300(a). In 1982, in *Hendrick Hudson Dist. Bd. of Educ. v. Rowley*, the United States Supreme Court addressed the meaning of FAPE and set forth a two-part analysis that must be made by courts and hearing officers in determining whether a school district has failed to provide FAPE as required by federal law. 458 U.S. 176, 206-07 (1982); *K.E. ex rel. K.E. v. Indep. Sch. Dist. No. 15*, 647 F.3d 795, 804 (8th Cir. 2011). The first inquiry that a court or hearing officer must make is that of whether the State, *i.e.* local educational agency or district, has complied with the procedures set forth in the IDEA. Thereafter, it must be determined whether the Student's education was reasonably calculated to enable the student to make progress that is appropriate in light of her individual circumstances. *Id.*

### *Procedural Violations of FAPE – Child Find*

It must first be determined whether District complied with the procedures set forth in the IDEA between August 14, 2019 and February 18, 2020. In the present case, Parent alleged that District failed to find Student eligible for special education services, failed to consider an evaluation provided by Parents, and failed to timely evaluate student. Some circuits have expressly stated that child find and failure to evaluate claims are procedural in nature and, therefore, must be analyzed prior to determining whether there was a substantive violation of the IDEA. *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 249-250 (3d Cir. 2012); *D.A. ex rel. Latasha A. v. Houston Indep. Sch. Dist.*, 629 F.3d 450, 453 (5th Cir. 2010); *Bd. of Educ. of Fayette Cnty. v. L.M.*, 478 F.3d 307, 313 (6th Cir. 2007).

Congress enacted the IDEA for the purpose of ensuring that all children with disabilities have access to a "free appropriate public education." 20 U.S.C. § 1400(d)(1)(A). In order to ensure that all children with disabilities receive a FAPE, school districts are required to satisfy a "child find" obligation. 20 U.S.C. § 1412(a)(3). Specifically, districts must ensure that:

> All children with disabilities residing in the States, regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services.

20 U.S.C. § 1412(a)(3)(A).

Child find extends to children who are suspected of having a disability and in need of special education, even though they are advancing from grade to grade. 34 C.F.R. §300.111(c)(1). Once a child is identified as potentially having a disability, the child's school district is required to conduct a full and individual evaluation to determine whether the child has a disability.  The IDEA requires that initial evaluations and reevaluations meet certain requirements. 34 C.F.R. § 300.304.  Specifically, a public agency must utilize a "variety of assessment tools and strategies to gather relevant functional, developmental, and academic information about the child." *Id.* at § 300.304(b)(1).   In addition, evaluations and reevaluations must assess all areas related to Student's suspected disability, "including, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities. *Id.* at § 300.304 (c)(4). Finally, initial evaluations must be completed within sixty (60) days of receiving parental consent for evaluation. *Id.* at § 300.301 (c)(1).

In the present case, it is the opinion of this Hearing Officer that District failed to engage in child find, failed to properly review and consider an evaluation that Parent obtained, and failed to comprehensively evaluate Student to determine whether special education services were necessary. Here, there were indications as early as September 2019 that Student may be in need of special education services.

First, the school was on notice that Student had received services as a preschooler for over a year. Although Student was determined in April 2019 to no longer be eligible for services, her history was sufficient to alert District in September 2019 that Student's behaviors could be a result of a disability. Second, Student's negative and aggressive behaviors were not occasional. Parent testimony, as well as behavioral documents, show that Student was acting out nearly every day, and the episodes were quite significant. Hitting teachers with open hands and fists, cursing in class, and ramming desks into others are not minor behavioral infractions that are typical of a kindergarten classroom.

Third, when Student's behaviors began to escalate out of control, the principal for Eudora Elementary School told Parent to go to Delta Counseling Services and have Student evaluated. In fact, the behavior calendar that was attached to the TLC documentation had a written notation that Student's suspension, which commenced on September 18, 2019, would be ongoing until Parent obtained this evaluation. The TLC paperwork for Student also indicated this referral. Further, the TLC paperwork referenced deficits in math and reading. Although there is no documentation to explain Student's academic achievement levels, the fact that District referenced these deficits indicates that it was aware at that time that Student could be in need of special education services. Considering Student's behavioral

issues and the fact that District was seeing some deficits in math and reading, it was clearly on notice of a suspected disability for Student, hence the recommendation to Parent for an evaluation. In fact, the use of the word recommendation is not wholly accurate because District made Student's return from suspension contingent on obtaining the Delta Counseling Services evaluation. At a minimum, District should have, at the moment that it felt compelled to send Parent to Delta Counseling Services, made a special education referral and sought to comprehensively evaluate Student for behavioral and academic issues.

Even if these events were not sufficient to trigger suspicion of a disability in the minds of District officials, there was no question in late September or early October 2019 that a comprehensive evaluation needed to be conducted. As instructed, Parent had obtained the evaluation that was recommended by District. The evaluation showed that Student had two different diagnoses that qualified her for one or more of the disability categories pursuant to the IDEA. Parent delivered this evaluation to District for consideration, whereupon District did nothing with the information.

Finally, even if District thought it was making the correct decision by transitioning Student to the TLC, the fact that Student was continuing to exhibit behavioral issues while in the TLC should have raised a question as to whether there were disability factors that needed consideration. While this Hearing Officer has no jurisdiction to deal with the issue of Student's sexual assault, the fact that this happened while Student was in the TLC indicates that Student was in an environment where little attention was being paid to her.

### *Substantive Violations of FAPE*

Having analyzed the first prong of the FAPE analysis, specifically that of procedural

violations, and determined that District failed to appropriately evaluate Student and engage

in child find activities pursuant to the IDEA, it is now necessary to consider whether the

District's actions resulted in a substantive denial of a FAPE to Student. Even if a school

district violated IDEA procedures, it does not automatically follow that the school district has

denied the child a FAPE. *K.E. v. Indep. Sch. Dist. 15*, 647 F.3d 795, 804 (8th Cir. 2011). Rather,

a school district's educational plan for a given student will only be set aside for IDEA

procedural violations "if the procedural inadequacies compromised the pupil's right to an

appropriate education, seriously hampered the parent's opportunity to participate in the

formulation process or caused a deprivation of educational benefits." *Id.* at 804-05.

Prior to March 22, 2017, Eighth Circuit law provided that if a student received "slight"

or "de minimis" progress, then he or she was not denied educational benefit. *K.E.*, 647 F.3d

at 810; *Paris Sch. Dist. v. A.H.*, 2017 WL 1234151 (W.D. Ark 2017). On March 22, 2017,

however, the United States Supreme Court "rejected the 'merely more than *de minimis*'

standard that had previously been the law of the Eighth Circuit." *Paris Sch. Dist.*, 2017 WL at

4 (citing *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1, No. 15-827*, 2017 WL

1066260, 580 U.S. ___ (2017), 137 S.Ct. 988 (2017)).

In *Endrew F.*, the standard set forth by the Court is "markedly more demanding" as

compared to the "merely *de minimis*" test outlined in *Rowley. Endrew F.*, 137 S. Ct. at 1000.

The Court stated the following:

> It cannot be the case that the Act typically aims for grade-level advancement
> for children with disabilities who can be educated in the regular classroom,

> but is satisfied with barely more than *de minimis* progress for those who cannot. When all is said and done, a student offered an educational program providing "merely more than de *minimis*" progress from year to year can hardly be said to have been offered an education at all. For children with disabilities, receiving instruction that aims so low would be tantamount to "sitting idly . . . awaiting the time when they were old enough to "drop out."

*Endrew F.*, 137 S.Ct. at 1001 (citations omitted). The Court held that the IDEA requires, even demands, more. Specifically, the IDEA requires that students under the Act be provided with an "educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.*

The IEP is the guiding document and primary method for providing special education services to disabled children under the IDEA. *Honig v. Doe*, 484 U.S. 305, 311 (1988). "Through the development and implementation of an IEP, the school provides a FAPE that is 'tailored to the unique needs of a particular child.'" *Paris Sch. Dist.*, 2017 WL 1234151, at *5 (citing *Endrew F.*, 2017 WL 1066260, at *1000). An IEP is not designed to be merely a form but, instead, a substantive document that is developed only after a district has carefully considered a student's "present levels of achievement, disability, and potential for growth." *Id.* (citations omitted). Pursuant to *Endrew F.*, a district "must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." 2017 WL 1066260, at *1000. For most students, to comply with this standard, providing FAPE "will involve integration in the regular classroom and individualized special education calculated to achieve advancement from grade to grade." *Id.* However, in the event that this is not possible, the education of a disabled child still needs to be "appropriately ambitious" in light of a student's individual circumstances. *Id.*

Every IEP, pursuant to the IDEA, is required to include the following: (1) a statement of a student's present levels of academic achievement and functional performance; (2) a description of how a student's disability affects his or her involvement and progress in the general education curriculum; (3) annual goals that are measurable, as well as a description as to how progress toward stated goals will be measured; and (4) a description of special education and related services provided to student.  20 U.S.C. § 1414(d)(1)(A)(i)(I)-(IV).

In the present case, it is the opinion of this Hearing Officer that the procedural failures of District between August 14, 2019 and February 18, 2020, specifically failing to identify Student for special education services, consider an evaluation provided by Parent at the recommendation of District, and comprehensively evaluate Student, resulted in a substantive denial of a FAPE.  As a result, Student's entire kindergarten year was spent without needed academic and behavioral supports and without an IEP to guide Student's educational programming. In addition, the failure of District to take all procedural steps required by the IDEA resulted in Student being referred, without appropriate evaluation, to the TLC. Not only did she continue to exhibit behavior issues there, indicating that this transfer was not addressing Student's deficits, but she was placed in a situation in which she was not monitored properly by her teacher and was sexually assaulted. These issues, certainly, have set her back in terms of her behavior. Specifically, Student's behavior now includes some incidences of sexually inappropriate conduct toward others. It is more likely than not that Student's academic and behavioral issues would have been remediated had she been evaluated and provided appropriate special education services beginning in September

2019 when District first began noting her extreme behavioral issues and her deficits in math and reading.

### ***Private Placement***

Private placement is an option in situations where a school district has determined that (1) a student is eligible for an IEP, and (2) it is unable to provide FAPE to a student based on available programs in the public-school setting. In the present case, Parent is requesting that this Hearing Officer order private placement to the Greenville Christian School in Greenville, Mississippi. Parent, however, has failed to meet her burden in terms of showing that private placement is the only option for Student to ensure a FAPE.

First, this is not a situation where District has attempted to provide FAPE to Student and failed to do so. Here, the procedural child find violation resulted in District providing no special education programming for Student during her kindergarten year. Because this Hearing Officer has determined that there have been procedural and substantive violations of FAPE, District must now take action to evaluate Student and create an appropriate IEP for her. No evidence was provided by Parent to establish that District would be unable to meet its statutory requirements in this regard. In fact, District provided evidence in the record that it was prepared to start this process immediately. At the time of Parent's due process hearing, counsel for Parent and District had agreed to begin a comprehensive evaluation for Student.

In addition, even if District could not provide FAPE to Student, Parent's choice of private placement was not established to be appropriate. Parent testified that the Greenville Christian School was an excellent school based on the recommendation of a family member.

Parent, at the time of the due process hearing, had not contacted the school, requested a visit, or inquired about the programs available at the school. Even if Parent had been able to establish that District was not able to provide FAPE, she failed to present sufficient evidence that the private placement of her choice would be appropriate. For all of these reasons, private placement is not an appropriate remedy in this situation.

### *Conclusion*

Having considered Parents' allegations of procedural and substantive due process violations, and in light of the findings and conclusions *supra*, it is the conclusion of this Hearing Officer that Student was denied FAPE between August 14, 2019 and February 18, 2020 as a result of procedural and substantive violations of the IDEA.

### ORDER:

The results of the testimony and evidence warrant a finding for Parent. Specifically, Parent introduced sufficient evidence in the record to establish by a preponderance of the evidence that District denied Student FAPE between August 14, 2019 and February 18, 2020. District is hereby ordered to take the following actions regarding Student:

(1) By or before July 13, 2020, District shall seek out and schedule any evaluations necessary to provide Student with a comprehensive evaluation for determination of IDEA eligibility and need for services. At a minimum, these evaluations must include the following: (1) comprehensive psychoeducational assessment; (2) comprehensive psychological evaluation; and (3) speech language evaluation.

(2) All evaluations ordered in the preceding paragraph, specifically paragraph (1) in this section, must be completed by August 15, 2020 and shall be paid for by District.

(3) District is required to hold an IEP meeting for Student by or before August 15, 2020. District shall find Student eligible for services and, at this IEP meeting, District and Parent shall discuss all evaluation results and determine appropriate programming, to include direct instruction, behavioral interventions, and related services to address Student's deficits. Student shall not be placed in the TLC.

(4) Student's IEP, as referenced in paragraph (3) of this section, must contain a provision for a BCBA of the District's choosing to observe Student and create a behavior intervention plan within the first 45 days of the 2020-2021 school year.

(5) Student's IEP, as referenced in paragraph (3) of this section, must provide for Student to have a 1:1 paraprofessional for the first 60 days of school, with reevaluation at that point to determine if the paraprofessional continues to be needed by Student.

(6) District shall schedule an IEP meeting every 60 days throughout Student's first grade year for the purpose of evaluating Student's progress, determining the need for a 1:1 paraprofessional, and making any necessary adjustments to Student's IEP.

**FINALITY OF ORDER AND RIGHT TO APPEAL:**

The decision of this Hearing Officer is final. A party aggrieved by this decision has the right to file a civil action in either Federal District Court or a State Court of competent jurisdiction, pursuant to the Individuals with Disabilities Education Act, within ninety (90) days after the date on which the Hearing Officer's Decision is filed with the Arkansas Department of Education.

Pursuant to Section 10.01.36.5, *Special Education and Related Services: Procedural Requirements and Program Standards,* Arkansas Department of Education 2008, the Hearing Officer has no further jurisdiction over the parties to the hearing.

**IT IS SO ORDERED.**

/s/ Danna J. Young
_____
**HEARING OFFICER**

06/18/2020
_____
**DATE**